**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**

| | |
|---|---|
| ETERNAL WORD TELEVISION NETWORK, INC., | |
| *and* | |
| STATE OF ALABAMA, | |
|        *Plaintiffs,* | |
| v. | CASE NO. 13-cv-521 |
| KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, THOMAS PEREZ, Secretary of the United States Department of Labor, UNITED STATES DEPARTMENT OF LABOR, JACOB LEW, Secretary of the United States Department of the Treasury, and UNITED STATES DEPARTMENT OF THE TREASURY, | **COMPLAINT** **(JURY TRIAL DEMANDED)** |
|        *Defendants* | |

COMPLAINT

Come now Plaintiffs Eternal Word Television Network, Inc., ("EWTN"), and the State of Alabama, by and through their attorneys, and state as follows:

NATURE OF THE ACTION

1.     This is a challenge to regulations (the "Mandate") issued under the Patient Protection and Affordable Care Act which seek to encourage the use of contraception and sterilization by requiring employer health insurance to cover these services for free. The mandated coverage includes "emergency contraceptives" which cause early abortions.

2.     Plaintiff EWTN was founded 32 years ago by a cloistered nun and has become the largest Catholic media network in the world. In obedience to Catholic teaching, EWTN cannot facilitate contraception, sterilization, or abortion. Indeed, EWTN believes these procedures—far from constituting "health care" or "preventive services"—instead involve gravely immoral practices, including the intentional destruction of innocent human life. Consequently, EWTN cannot participate in the Mandate's scheme without violating its beliefs and publicly contradicting its mission of "communicat[ing] the teachings and beauty of the Catholic Church."

3.     EWTN qualifies for no exemption from the Mandate. While "religious employers" are exempt, Defendants have limited that term only to churches, their integrated auxiliaries, and religious orders.

4.     The final version of the Mandate does offer EWTN—and other non-exempt organizations—a so-called "accommodation." This is a mere fig leaf. It would still require EWTN to play a central role in the government's scheme by "designating" a fiduciary to pay for

the objectionable services on EWTN's behalf. This would do nothing to assuage EWTN's objections to the Mandate.

5.     The so-called "accommodation" also continues to treat EWTN as a second-class religious organization, not entitled to the same religious freedom rights as the Church it exists to serve. It also creates administrative hurdles and other difficulties for EWTN, forcing it to seek out and contract with companies willing to provide the very drugs and services that EWTN speaks out against.

6.     If EWTN does not compromise its religious convictions and comply with the Mandate, however, it faces severe penalties that could exceed $12 million per year.

7.     The State of Alabama has a sovereign prerogative to regulate its insurance market in accordance with its own law and policy, without being contradicted by unlawful federal regulations. The Mandate imposes immediate and continuing burdens on the State of Alabama and its citizens. The Mandate—if it were lawful—would preempt Alabama's comprehensive body of regulation of the benefits that health insurance plans must provide.

8.     Defendants have violated the Religious Freedom Restoration Act, as well as the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment of the United States Constitution, the Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act. Plaintiffs therefore respectfully request declaratory and permanent injunctive relief.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1361. This action arises under the Constitution and laws of the United States.  This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

10.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e).

**IDENTIFICATION OF PARTIES**

11.     Plaintiff EWTN is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code and is principally located in Jefferson County, Alabama.

12.     Plaintiff State of Alabama is a sovereign State of the United States of America by and through Attorney General Luther Strange, who may bring this action on behalf of the State. *See* Ala. Code § 36-15-12.

13.     Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the challenged regulations.

14.     Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services (HHS). In this capacity, she has responsibility for the operation and management of HHS.  Sebelius is sued in her official capacity only.

15.     Defendant Department of Health and Human Services is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged regulations.

16.     Defendant Thomas Perez is the Secretary of the United States Department of Labor. In this capacity, he has responsibility for the operation and management of the Department of Labor. Perez is sued in his official capacity only.

17.     Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged regulations.

18.     Defendant Jacob Lew is the Secretary of the Department of the Treasury. In this capacity, he has responsibility for the operation and management of the Department. Lew is sued in his official capacity only.

19.     Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged regulations.

**FACTUAL ALLEGATIONS**

I.     **EWTN's Religious Beliefs and Practices Related to Contraception, Sterilization, and Abortion.**

20.     In 1981, Mother M. Angelica, a cloistered nun of the Poor Clares of Perpetual Adoration order, founded EWTN on the property of Our Lady of Angels Monastery in Irondale, Alabama.  Since then, EWTN has become the largest Catholic media network in the world, transmitting programming twenty-four hours a day in English, Spanish, German, and other language channels on over eleven full-time television feeds to more than 230 million homes in 144 countries and territories on more than 5,000 multichannel video programming distribution systems, two distinct twenty-four hour radio services broadcast worldwide on shortwave radio, satellite radio, direct over internet, and through more than 230 affiliated broadcast stations in the United States as well as other communications media, such as its principal website which receives approximately 3 million visits per month.

21.     EWTN airs family and religious programming from a Catholic point of view that presents the teachings of the Catholic faith as defined by the Magisterium (teaching authority) of the Catholic Church. Additionally, it provides spiritual devotions based on Catholic religious practice, and airs daily live Masses and prayers. Providing more than 80% original programming, EWTN also offers talk shows, children's animation, teaching series, documentaries, and live

coverage of Catholic Church events. EWTN also has an internal printing press, which it uses to mail out newsletters that feature Catholic teaching.

22.　　A deep devotion to the Catholic faith is central to EWTN's mission.  In the network's own words:

> Eternal Word Television Network is dedicated to the advancement of truth as defined by the Magisterium of the Roman Catholic Church. The mission of the Eternal Word Television Network is to serve the orthodox belief and teaching of the Church as proclaimed by the Supreme Pontiff and his predecessors.  The goal of the Eternal Word Television Network is to provide the means by which the various organizations within the Church will have a nation-wide vehicle of expression.  This will be provided for them without charge as long as their spirituality remains within the theological context of Mother Church.  This is best evidenced by the acceptance of the Dogmas, Rules and Regulations of the Church in all matters, but especially as they relate to the topics on which their television presentation is based.  As the Eternal Word Television Network exists to provide a media for orthodox endeavors, this mission statement should be viewed as the basis of or foundation for this essential spiritual growth ministry, not as an attempt to censor any organization or individual[.]

Indeed, above and beyond EWTN's religious programming, the network's religious centers themselves are visited daily by pilgrims who travel to worship at the daily Masses held at the chapel on EWTN's campus in Irondale, Alabama. The chapel is open every day from 6:00 AM to 9:00 PM. EWTN's principal campus houses an order of Franciscan friars near the EWTN chapel, who work closely with EWTN in a number of its activities, including celebrating Mass at the chapel.

23.　　The EWTN grounds highlight religious devotion and include an outdoor shrine, a Stations of the Cross devotional area, private prayer areas, and religious statues throughout.

24.　　Almost every room within EWTN buildings features religious images and icons, including crucifixes, depictions of the Pietà, paintings of saints, and Bible verses and prayers.

25.     This is also generally true of employee-controlled spaces. Employees are permitted to decorate their own work places, and a large number have heavily adorned the spaces with pictures of Catholic saints, prayers, and religious icons.

26.     EWTN holds and actively professes religious beliefs that include traditional Christian teachings on the sanctity of life.  It believes and teaches that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious from the moment of conception.  EWTN therefore believes and teaches that abortion ends a human life and is a grave sin.

27.     EWTN's religious beliefs also include traditional Christian teaching on the nature and purpose of human sexuality, beliefs which exclude the use of contraceptive drugs and devices as well as voluntary sterilization methods. In particular, EWTN believes, in accordance with traditional Catholic doctrine as articulated and confirmed by Pope Paul VI's 1968 encyclical *Humanae Vitae*, that human sexuality has two primary purposes: to "most closely unit[e] husband and wife" and "for the generation of new lives." Accordingly, EWTN believes and actively professes, with the Catholic Church, that "[t]o use this divine gift destroying, even if only partially, its meaning and its purpose is to contradict the nature both of man and of woman and of their most intimate relationship, and therefore it is to contradict also the plan of God and His Will."  Therefore, EWTN believes and teaches that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception and sterilization—is a grave sin.

28.     Furthermore, EWTN subscribes to authoritative Catholic teaching about the proper nature and aims of health care and medical treatment. For instance, EWTN believes, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death'

can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life." EWTN likewise believes and teaches that sterilization and contraceptives are not properly understood as health care, since pregnancy and the natural process of human reproduction are not diseases to be cured.

29.     On numerous occasions, EWTN has publicly proclaimed the foregoing moral precepts as authentic and binding Catholic doctrine through its television, radio, and internet transmissions. EWTN will continue to do so.

30.     EWTN has approximately 350 employees.

31.     As part of its commitment to Catholic social teaching, EWTN promotes the well-being and health of its employees and their families. In furtherance of these beliefs, EWTN has striven over the years to provide employee health coverage superior to coverage generally available in the Alabama market.

32.     Moreover, as part of its religious commitment to the authoritative teachings of the Catholic Church, EWTN cannot facilitate access to health care insurance—or any form of payment, whether or not denominated "insurance coverage"—that covers artificial contraception, sterilization, or abortion, or related education and counseling, without violating its deeply held religious beliefs and without publicly contradicting the same Catholic doctrine that EWTN routinely proclaims through its television, radio, and internet transmissions.

33.     EWTN ensures that its insurance plan does not cover or otherwise facilitate access to drugs, devices, services or procedures inconsistent with its faith. In particular, EWTN has taken great pains through the years to ensure that its insurance plans do not cover, or in any way facilitate access to, sterilization, contraception, or abortion.

34.     EWTN cannot provide information or guidance to its employees about other locations or means through which they can access artificial contraception, sterilization, abortion, or related education and counseling, without violating its deeply held religious beliefs and without publicly contradicting its own mission. Many of EWTN's employees choose to work at EWTN because they share its religious beliefs and wish to help EWTN further its mission of sharing Catholic teaching. EWTN would violate their implicit trust in the organization and detrimentally alter its relationship with its employees if it were to violate its religious beliefs regarding abortion, sterilization and contraception.

35.     Furthermore, EWTN exists on donations from the public. EWTN does not generate revenue from carriage fees and advertising, and indeed prohibits any form of commercial advertising on its television services. Donors who give to EWTN do so with an understanding of EWTN's mission and with the assurance that EWTN will continue to adhere to, disseminate, and report reliable Catholic teachings on morality and practices, as its Mission Statement has declared since its inception.

36.     Therefore EWTN cannot operate in a manner known to be morally repugnant to its donors and in ways that violate the implicit trust of the purpose of their donations.

## II. The State of Alabama's regulation of health insurance plans

37.     The State of Alabama regulates health insurance plans through a comprehensive system of laws, which requires that plans cover certain services, such as mammograms, and not others, such as abortifacients. For example, any health benefit plan that offers prescription drug benefits must comply with Ala. Code Sections 27-1-21 and 27-1-22 and Section 27-45-1, *et seq.,* which expressly provide that those plans do *not* have to cover any contraceptive or abortifacient drugs and devices, or any counseling or education associated with them. All health policies

providing coverage on an expense-incurred basis shall provide benefits for newborn children per Section 27-19-38. Every health insurance benefit plan which provides coverage for surgical services for a mastectomy must comply with Section 27-50-1, *et seq.*  Every health insurance benefit plan that provides maternity coverage must comply with Section 27-48-1, *et seq.* Certain health benefit plans shall offer coverage for annual screening for the early detection of prostate cancer in men over age forty per Section 27-58-1, *et seq.* Certain health benefit plans shall offer to cover chiropractic services per Section 27-59-1, *et seq.* These mandates strike an intentional balance between the cost and availability of health insurance; each new mandate requires a cost-benefit calculation because, in the aggregate, mandates drive up the cost of health insurance and make it less affordable.

38.     The State of Alabama imposes the second least number of health insurance mandates of any State and has chosen not to impose a contraception mandate on otherwise heavily-regulated insurance plans. *See* 4 Compensation and Benefits § 56:32 (July 2012) (list of mandates in Alabama); Victoria Craig Bunce, 2011 Health Insurance Mandates in the States, Executive Summary, Tables 1 & 3. The pharmaceutical insurance coverage article of the Alabama Code expressly "do[es] not mandate that any type of benefits for pharmaceutical services, including without limitation, prescription drugs, be provided by a health insurance policy or an employee benefit plan." Ala. Code § 27-45-5.

39.     Alabama's government and people also have a long tradition of respect for religious freedom and the right to conscience. For the State's roughly 200-year history, Alabama's Constitution has declared—in every iteration—"that the civil rights, privileges, and capacities of any citizen shall not be in any manner affected by his religious principles." Ala. Const. art. I, sec. 3 (1901); Ala. Const. art. I, sec. 4 (1875); Ala. Const. art. I, sec. 4 (1865); Ala. Const. art I, sec. 6

(1861); Ala. Const. art. I, sec. 6 (1819). And, in the 1998 election, Alabama voters ratified the Alabama Religious Freedom Amendment ("ARFA") to the Constitution, which tracks the language and intent of the federal RFRA. *See* Ala. Const., amend. 622. Alabama is one of only a dozen states that have enacted such a law, and it is the only state to have done so by an amendment to its constitution.

40.     In November 2012, the people of Alabama voted to adopt an amendment to the Alabama Constitution to prohibit any person or employer, such as EWTN, from being compelled to participate in a health care system. Amendment 864 to the Alabama Constitution provides in relevant part: "In order to preserve the freedom of all residents of Alabama to provide for their own health care, a law or rule shall not compel, directly or indirectly, any person, employer, or health care provider to participate in any health care system." Ala. Const. Amend. No. 864.

41.     If lawful, the Mandate would displace Alabama's regulatory choice and strike a new and different balance between the cost and availability of health insurance.

**III. The Affordable Care Act and Preventive Care Mandate**

42.     In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act."

43.     The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

44.     One provision of the Act mandates that any "group health plan" or "health insurance issuer offering group or individual health insurance coverage" must "provide coverage" for certain preventive care services. 42 U.S.C. § 300gg-13(a).

45.     The services required to be covered include medications, screenings, and counseling given an "A" or "B" rating by the United States Preventive Services Task Force;[1] immunizations recommended by the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; and "preventive care and screenings" specific to infants, children, adolescents, and women, as to be "provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(1)-(4).

46.     The statute specifies that all of these services must be provided without "any cost sharing." 42 U.S.C. § 300gg-13(a).

<u>The Interim Final Rule</u>

47.     On July 19, 2010, HHS[2], along with the Department of Treasury and the Department of Labor, published an interim final rule under the Affordable Care Act. 75 Fed. Reg. 41726, 41728 (2010). The interim final rule required providers of group health insurance to cover preventive services without cost sharing.  75 Fed. Reg. 41759 (2010).

48.     The interim final rule was enacted without prior notice of rulemaking or opportunity for public comment, because Defendants determined for themselves that "it would be impracticable and contrary to the public interest to delay putting the provisions . . . in place until a full public notice and comment process was completed." 75 Fed. Reg. at 41730.

---

[1]   The list of services that currently have an "A" or "B" rating include medications like aspirin for preventing cardiovascular disease, vitamin D, and folic acid; screenings for a wide range of conditions such as depression, certain cancers and sexually-transmitted diseases, intimate partner violence, obesity, and osteoporitis; and various counseling services, including for breastfeeding, sexually-transmitted diseases, smoking, obesity, healthy dieting, cancer, and so forth. *See* http://www.uspreventiveservicestaskforce.org/uspstf/uspsabrecs.htm (last visited Aug. 25, 2013); *see also* 75 Fed. Reg. 41726, 41740 (2010).

[2]   For ease of reading, references to "HHS" in this Complaint refer to all Defendants, unless context indicates otherwise.

49. Although Defendants suggested in the Interim Final Rule that they would solicit public comments after implementation, they stressed that "provisions of the Affordable Care Act protect significant rights" and therefore it was expedient that "participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities." *Id.*

50. Defendants stated they would later "provide the public with an opportunity for comment, but without delaying the effective date of the regulations," demonstrating their intent to impose the regulations regardless of the legal flaws or general opposition that might be manifest in public comments. *Id.*

51. In addition to reiterating the Affordable Care Act's preventive services coverage requirements, the Interim Final Rule provided further guidance concerning the Act's restriction on cost sharing.

52. The Interim Final Rule makes clear that "cost sharing" refers to "out-of-pocket" expenses for plan participants and beneficiaries. 75 Fed. Reg. at 41730.

53. The Interim Final Rule acknowledges that, without cost sharing, expenses "previously paid out-of-pocket" would "now be covered by group health plans and issuers" and that those expenses would, in turn, result in "higher average premiums for all enrollees." *Id.*; *see also id.* at 41737 ("Such a transfer of costs could be expected to lead to an increase in premiums.")

54. In other words, the prohibition on cost-sharing was simply a way "to distribute the cost of preventive services more equitably across the broad insured population." 75 Fed. Reg. at 41730.

55. After the Interim Final Rule was issued, a number of groups filed comments warning of the potential conscience implications of requiring religious individuals and groups to cover

certain kinds of services—specifically, contraception, sterilization, and abortion—in their health care plans.

56.     HHS directed a private health policy organization, the Institute of Medicine ("IOM"), to make recommendations regarding which drugs, procedures, and services should be covered by all health plans as preventive care for women. See http://www.hrsa.gov/womensguidelines (attached as Exhibit A) (last visited Oct. 24, 2013).

57.     In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum.

58.     No religious groups or other groups that oppose government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

59.     One year after the first interim final rule was published, on July 19, 2011, the IOM published its preventive care guidelines for women. It recommended that the required preventive services include sterilization procedures and "[a]ll Food and Drug Administration approved contraceptive methods [and] sterilization procedures." Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, at 102-10 and Recommendations 5.5 (July 19, 2011).

60.     FDA-approved contraceptive methods include birth-control pills; prescription contraceptive devices, including IUDs; Plan B (also known as the "morning-after pill"); and ulipristal (also known as "ella" or the "week-after pill"); and other drugs, devices, and procedures.

61. "Emergency contraceptives" such as Plan B, ella, and certain IUDs can cause the death of an embryo by preventing it from implanting in the wall of the uterus.

62. Indeed, the FDA's own Birth Control Guide states that both Plan B, ella, and certain IUDs can work by "preventing attachment (implantation) to the womb (uterus)." FDA, Office of Women's Health, Birth Control Guide at 11-12, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm (last visited Oct. 24, 2013) (attached as Exhibit B).

63. EWTN has a sincere religious objection to providing coverage for emergency contraceptive drugs such as Plan B, ella, and certain IUDs since those drugs and devices risk preventing a human embryo, which they understand to include a fertilized egg before it implants in the uterus, from implanting in the wall of the uterus, thereby causing the death of a human person.

64. EWTN believes that artificially preventing the implantation of a human embryo constitutes an abortion.

65. EWTN believes that Plan B, ella, and certain IUDs can cause the death of the embryo, which EWTN believes to be a person.

66. Plan B, ella, and certain IUDs can prevent the implantation of a human embryo in the wall of the uterus.

67. Thus, Plan B, ella, and certain IUDs can cause the death of the embryo.

68. On August 1, 2011, just thirteen days after the IOM published its recommendations, HRSA issued guidelines adopting the IOM recommendations in full. *See* Exhibit A, http://www.hrsa.gov/womensguidelines.

The "Religious Employers" Exemption

69.     That same day, HHS promulgated an additional Interim Final Rule. 76 Fed. Reg. 46621 (published Aug. 3, 2011).

70.     This Second Interim Final Rule granted HRSA "*discretion* to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46621, 46623 (emphasis added). The term "religious employer" was restrictively defined as one that (1) has as its purpose the "inculcation of religious values"; (2) "primarily employs persons who share the religious tenets of the organization"; (3) "serves primarily persons who share the religious tenets of the organization"; and (4) "is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46626.

71.     The fourth of these requirements refers to "churches, their integrated auxiliaries, and conventions or associations of churches" and the "exclusively religious activities of any religious order." 26 U.S.C.A. § 6033.

72.     Thus, the "religious employers" exemption was severely limited to formal churches and religious orders whose purpose is to inculcate faith and who hire and serve primarily people of their own faith tradition.

73.     HRSA exercised its discretion to grant an exemption for religious employers via a footnote on its website listing the Women's Preventive Services Guideline. The footnote states that "guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers." *See* Exhibit A at n.**, http://www.hrsa.gov/womensguidelines.

74.   Although religious organizations like EWTN share the same religious beliefs and concerns as objecting churches, their integrated auxiliaries, and objecting religious orders, HHS deliberately ignored the regulation's impact on their religious liberty, stating that the exemption sought only "to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. 46621, 46623.

75.   Thus, the vast majority of religious organizations with conscientious objections to providing contraceptive or abortifacient services were excluded from the "religious employers" exemption.

76.   Like the original Interim Final Rule, the Second Interim Final Rule was made effective immediately, without prior notice or opportunity for public comment.

77.   Defendants acknowledged that "while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations," they had "good cause" to conclude that public comment was "impracticable, unnecessary, or contrary to the public interest" in this instance. 76 Fed. Reg. at 46624.

78.   Upon information and belief, after the Second Interim Final Rule was put into effect, over 100,000 comments were submitted opposing the narrow scope of the "religious employers" exemption and protesting the contraception mandate's gross infringement on the rights of religious individuals and organizations.

79.   HHS did not take into account the concerns of religious organizations in the comments submitted before the Second Interim Rule was issued.

80.    Instead the Second Interim Rule was unresponsive to the concerns, including claims of statutory and constitutional conscience rights, stated in the comments submitted by religious organizations.[3]

The Safe Harbor

81.    The public outcry for a broader religious employers exemption continued for many months and, on January 20, 2012, HHS issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with the new law." *See* Jan. 20, 2012 Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited Oct. 24, 2013) (attached as Exhibit C).

82.    On February 10, 2012, HHS formally announced a "safe harbor" for non-exempt non-profit religious organizations that objected to covering free contraceptive and abortifacient services.

83.    Under the safe harbor, HHS agreed it would not take any enforcement action against an eligible organization during the safe harbor, which would remain in effect until the first plan year beginning after August 1, 2013.

84.    HHS also indicated it would develop and propose changes to the regulations to accommodate the objections of non-exempt, non-profit religious organizations following August 1, 2013.

---

[3]    EWTN filed suit against this early version of the Mandate as a sole plaintiff in February 2012. The suit was dismissed without prejudice on ripeness grounds since the final Mandate had not yet been issued. *See EWTN v. Sebelius*, Case No. 2:12-cv-501, Dkt. No. 79 (N.D. Ala. March 25, 2013).

85.     Despite the safe harbor and HHS's accompanying promises, on February 15, 2012, HHS published a final rule "finalizing, without change," the contraception and abortifacient mandate and the narrow religious employers exemption. 77 Fed. Reg. 8725-01 (published Feb. 15, 2012).

<u>The Advance Notice of Proposed Rulemaking</u>

86.     On March 21, 2012, HHS issued an Advance Notice of Proposed Rulemaking (ANPRM), presenting "questions and ideas" to "help shape" a discussion of how to "maintain the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations. 77 Fed. Reg. 16501, 16503 (2012).

87.     The ANPRM conceded that forcing religious organizations to "contract, arrange, or pay for" the objectionable contraceptive and abortifacient services would infringe the objecting employers' "religious liberty interests." *Id*. (emphasis added).

88.     In vague terms, the ANPRM proposed that the "health insurance issuers" for objecting religious employers could be required to "assume the responsibility for the provision of contraceptive coverage without cost sharing." *Id*.

89.     For self-insured plans, the ANPRM suggested that third party plan administrators "assume this responsibility." *Id*.

90.     For the first time, and contrary to the earlier definition of "cost sharing," Defendants suggested in the ANPRM that insurers and third party administrators could be prohibited from passing along their costs to the objecting religious organizations via increased premiums. *See id*.

91.      "[A]pproximately 200,000 comments" were submitted in response to the ANPRM, 78 Fed. Reg. 8456, 8459, largely reiterating previous comments that the ANPRM's proposals would not resolve conscientious objections because the objecting religious organizations, by

providing a health care plan in the first instance, would still be coerced to arrange for and facilitate access to abortifacient services.

The Notice of Proposed Rulemaking

92.     On February 1, 2013, HHS issued a Notice of Proposed Rulemaking (NPRM) purportedly addressing the comments submitted in response to the ANPRM. 78 Fed. Reg. 8456 (published Feb. 6, 2013).The NPRM proposed two changes to the then-existing regulations. 78 Fed. Reg. 8456, 8458-59. First, it proposed revising the religious employers exemption by eliminating the requirements that religious employers have the purpose of inculcating religious values and that they primarily employ and serve only persons of the same faith. 78 Fed. Reg. at 8461.

93.     Under this proposal a "religious employer" would be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 8461. HHS emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." 78 Fed. Reg. 8456, 8461.

94.     In other words, religious organizations like EWTN that are not formal churches or religious orders would continue to be excluded from the exemption.

95.     Second, the NPRM reiterated HHS's intention to "accommodate" non-exempt non-profit religious organizations by requiring their insurers and third party administrators to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

96.     The proposed "accommodation" did not resolve the concerns of religious organizations like EWTN because it would continue to force them to deliberately provide health

insurance that would trigger access to contraceptives, abortion-inducing drugs, and related education and counseling.

97.     In issuing the NPRM, HHS requested comments from the public by April 8, 2013. 78 Fed. Reg. 8457.

98.     "[O]ver 400,000 comments" were submitted in response to the NPRM, 78 Fed. Reg. 39870, 39871, with religious organizations again overwhelmingly decrying the proposed accommodation as a gross violation of their religious liberty because it would conscript their health care plans as the main cog in the government's scheme for expanding access to contraceptive and abortifacient services.

99.     EWTN submitted comments on the NPRM that stated many of the same objections stated in this complaint.

100.    On April 8, 2013, the same day the notice-and-comment period ended, Defendant Secretary Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.

101.    In her remarks, Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception. Churches and church dioceses as employers are exempted from this benefit. But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage to their employees* starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included in the benefit package*.

*See* The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, *available at* http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (from 51:20 to 53:56) (last visited Oct. 24, 2013) (emphases added).

102.    It is clear from the timing of these remarks that Defendants gave no consideration to the comments submitted in response to the NPRM's proposed "accommodation."

        The Mandate

103.    On June 28, 2013, Defendants issued a final rule (the "Mandate"), which ignores the objections repeatedly raised by religious organizations—including objections raised by EWTN—and continues to co-opt objecting religious employers into the government's scheme of expanding free access to contraception, sterilization, and abortifacient drugs and devices. 78 Fed. Reg. 39870.

104.    Under the Mandate, the discretionary "religious employers" exemption, which is still implemented via footnote on the HRSA website, *see* Ex. A, http://www.hrsa.gov/womensguidelines, remains limited to formal churches and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39874.

105.    All other religious organizations, including EWTN, are excluded from the exemption.

106.    The Mandate creates a separate "accommodation" for certain non-exempt religious organizations. 78 Fed. Reg. at 39874.

107.    An organization is eligible for the accommodation if it (1) "opposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a non-profit entity"; (3) "holds itself out as a religious organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874.

108.    The self-certification must be executed "prior to the beginning of the first plan year to which the accommodation is to apply." 78 Fed. Reg. at 39875.

109.    The Final Rule extends the current safe harbor through the end of 2013. 78 Fed. Reg. at 39889.

110.    Thus, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014, and deliver it to the organization's insurer or, if the organization has a self-insured plan, to the plan's third party administrator. 78 Fed. Reg. at 39875.

111.    By the terms of the accommodation, EWTN will be required to execute the self-certification and deliver it to its plan's third party administrator before July 1, 2014.

112.    The self-certification must instruct the third party administrator of its "obligations set forth in the[] final regulations," and by delivering this self-certification to its third party administrator, EWTN would "designat[e]" the third party administrator as the "plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." 78 Fed. Reg. at 39879. This triggers the third party administrator's obligation to make "separate payments for contraceptive services directly for plan participants and beneficiaries." *Id.* at 39875-76.

113.    EWTN would have to identify its employees to its third party administrator for the distinct purpose of enabling the government's scheme of facilitating free access to contraceptive and abortifacient services and related education and counseling.

114.    The insurer's and third party administrator's obligation to make direct payments for contraceptive and abortion services would continue only "for so long as the participant or beneficiary remains enrolled in the plan." 78 Fed. Reg. at 39876.

115.    Thus, EWTN would have to coordinate with its third party administrator regarding when it was adding or removing employees and beneficiaries from its healthcare plan and, as a result, from the contraceptive and abortifacient services payment scheme.

116.    The third party administrators would be required to notify plan participants and beneficiaries of the contraceptive payment benefit "contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment" in a group health plan. 78 Fed. Reg. at 39876.

117.    This would also require EWTN to coordinate the notices with its third-party administrator.

118.    The third-party administrators would be required to provide the contraceptive benefits "in a manner consistent" with the provision of other covered services. 78 Fed. Reg. at 39876-77.

119.    Therefore, any payment or coverage disputes presumably would be resolved under the terms of EWTN's existing plan documents.

120.    Under the accommodation, issuers "may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), *or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly*, on the eligible organization." 78 Fed. Reg. at 39896 (emphasis added).

121.    For all other preventive services, including non-contraceptive preventive services for women, only cost-sharing (*i.e.*, out-of-pocket expense) is prohibited. There is no restriction on passing along costs via premiums or other charges.

122.    Defendants state that they "continue to believe, and have evidence to support," that providing payments for contraceptive and abortifacient services will be "cost neutral for issuers," because "[s]everal studies have estimated that the costs of providing contraceptive coverage are

23

balanced by cost savings from lower pregnancy-related costs and from improvements in women's health." 78 Fed. Reg. at 39877.

123.   On information and belief, the studies Defendants rely upon to support this claim are severely flawed.

124.   Further, Defendants acknowledge "there is no obligation for a third party administrator to enter into or remain in a contract with the eligible organization if it objects to any of these responsibilities." 78 Fed. Reg. at 39880.

125.   Thus, the burden remains on the objecting religious organization to find a third party administrator that will agree to provide free access to the same contraceptive and abortifacient services the religious organization cannot directly provide.

126.   EWTN's religious beliefs preclude it from soliciting, contracting with, or designating a third party to provide these services, whether expressly or impliedly.

127.   Moreover, the Mandate requires that, even if the third party administrator consents, the religious organization—via its self-certification—must expressly designate the third party administrator as "an ERISA section 3(16) plan administrator and claims administrator solely for the purpose of providing payments for contraceptive services for participants and beneficiaries." 78 Fed. Reg. at 39879.

128.   The self-certification must specifically notify the third party administrator of its "obligations set forth in the[] final regulations, and will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." 78 Fed. Reg. at 39879.

129.    Because the designation makes the third-party administrator a plan administrator with fiduciary duties, the payments for contraceptive and abortifacient services would be payments made under the objecting religious organization's plan.

130.    Because EWTN would be required to identify and designate a third-party administrator willing to administer the contraceptive and abortifacient services, EWTN's religious beliefs preclude it from complying with the accommodation.

131.    The Final Rule sets forth complex means through which a third party administrator may seek to recover its costs incurred in making payments for contraceptive and abortifacient services.

132.    The third party administrator must identify an issuer who participates in the federal exchanges established under the Affordable Care Act and who would be willing to make payments on behalf of the third party administrator.

133.    Cooperating issuers would then be authorized to obtain refunds from the user fees they have paid to participate in the federal exchange as a means of being reimbursed for making payments for contraceptive and abortifacient services on behalf of the third party administrator.

134.    Issuers would be required to pay a portion of the refund back to the third party administrator to compensate it for any administrative expenses it has incurred.

135.    These machinations, ostensibly employed to shift the *cost* of the Mandate, are severely flawed.

136.    There is no way to ensure that the cost of administering the contraceptive and abortifacient services would not be passed on to EWTN through future increases to the third party administrator's fees.

137.     Moreover, taking the user fees intended for funding the federal exchanges and using them to provide contraceptive and abortifacient services to employees not participating in the federal exchanges would violate the statute authorizing the user fees. *See* 78 Fed. Reg. at 15412; 31 U.S.C. § 9701.

138.     In sum, for both insured and self-insured organizations, the accommodation is nothing more than a shell game that attempts to disguise the religious organization's role as the central cog in the government's scheme for expanding access to and the use of contraceptive and abortifacient services and related education and counseling.

139.     Despite the accommodation's convoluted machinations, the religious organization's health insurance continues to serve as the trigger for creating access to free contraceptive and abortifacient services.

140.     EWTN cannot participate in or facilitate the government's scheme in this manner without violating its religious convictions.

<u>EWTN's Health Care Plan and Religious Objection</u>

141.     The plan year for EWTN's healthcare plan begins on July 1 of each year.

142.     EWTN's employee health care plan is self-insured.

143.     Thus, beginning on or about July 1, 2014, EWTN faces the choice either of including free coverage for contraceptive and abortifacient services, and related education and counseling, in its employee healthcare plan or else of "designating" its third party administrator as its agent to provide free coverage for exactly the same services.

144.     EWTN's religious convictions equally forbid it from choosing either one of these options. That is, EWTN cannot include free coverage for contraceptive and abortifacient services, and related education and counseling, in its employee healthcare plans. Nor can EWTN

"designate" its third party administrator as a plan administrator with obligations to provide free access to the same services.

145.    From EWTN's perspective, "designating" its third party administrator as its agent to provide access to contraceptive and abortifacient services is no different than directly providing that access.

146.    EWTN is not eligible for the religious employers exemption because it is not an organization "described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. 46621, 46626.

147.    Nor does EWTN's employee healthcare plan meet the definition of a "grandfathered" plan.

148.    Thus, EWTN's employee healthcare plans do not include the notices required to claim grandfathered status.

149.    The Mandate imposes government pressure and coercion on EWTN to change or violate its religious beliefs.

150.    Because EWTN refuses to comply with the Mandate and refuses to designate its third party administrator to carry out the Mandate, it faces crippling fines of $100 each day, "for each individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1).

151.    Dropping its employee insurance is not a realistic option, however, because doing so would place EWTN at a severe competitive disadvantage in its efforts to recruit and retain employees.

152.    EWTN would also face fines of $2000 per year for each of its employees for dropping its insurance plans.

153.    Although the government has recently announced that it will postpone implementing the annual fine of $2000 per employee for organizations that drop their insurance altogether, the postponement is only for one year, until 2015. This postponement does not delay the crippling daily fines under 26 U.S.C. § 4980D.

154.    EWTN's Catholic faith compels it to promote the spiritual and physical well-being of its employees by providing them with generous health services.

155.    It would violate EWTN's sincere religious beliefs to drop coverage for its employees and force them to buy insurance that is not only less generous, but also covers contraceptive and abortifacient drugs and devices.

### The Government Cannot Satisfy Its Burden Under Strict Scrutiny

156.    The government lacks any compelling interest in coercing EWTN to facilitate access to contraceptive and abortifacient services.

157.    The required contraceptive and abortifacient drugs, devices, and related services are already widely available at little cost.

158.    There are multiple ways in which the government could provide access without co-opting religious employers and their insurance plans in violation of their religious beliefs.

159.    For example, it could pay for the objectionable services through its existing network of family planning services funded under Title X, through direct government payments, or through tax deductions, refunds, or credits.

160.    The government could also simply exempt all religious organizations, just as it has already exempted nonprofit religious employers referred to in Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

161.    The government could also use its own newly established healthcare exchanges to provide the additional insurance coverage it believes is needed, rather than forcing EWTN to do so.

162.    HHS claims that its "religious employers" exemption does not undermine its compelling interest in making contraceptive and abortifacient services available for free to women because "houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people who are of the same faith and/or adhere to the same objection, and who would therefore be less likely than other people to use contraceptive services, even if such services were covered under their plan." 78 Fed. Reg. at 39887.

163.    Because of EWTN's express mission of promoting the sanctity of life, opposing abortion, and promoting God's purpose for human sexuality, EWTN's employees are just as likely as—if not more likely than—employees of many exempt organizations to adhere to the same values with respect to use of the objectionable drugs, devices, and services.

164.    In one form or another, the government also provides exemptions for grandfathered plans, 42 U.S.C. § 18011; 75 Fed. Reg. 41,726, 41,731 (2010), small employers with fewer than 50 employees, 26 U.S.C. § 4980H(c)(2)(A), and certain religious denominations, 26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

165.    These broad exemptions further demonstrate that the government has no compelling interest in refusing to include religious organizations like EWTN within its religious employers exemption.

166.    Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

167.    Indeed, HHS has predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans through at least 2014, and that a third of medium-sized employers with between 50 and 100 employees may do likewise. 75 Fed. Reg.   34538   (June   17,   2010);   *see   also*   75   Fed.   Reg.   34540,   34552   Tbl.3; http://web.archive.org/web/20130620171510/http://www.healthcare.gov/news/factsheets/2010/0 6/keeping-the-health-plan-you-have-grandfathered.html   at   4-5   (archived   version)   (last   visited Oct.        24,        2013)        (attached        as        Exhibit        D); https://www.cms.gov/CCIIO/Resources/Files/factsheet_grandfather_amendment.html   (noting that amendment to regulations "will result in a small increase in the number of plans retaining their grandfathered status relative to the estimates made in the grandfathering regulation") (last visited Oct. 24, 2013) (attached as Exhibit E).

168.    Further, the government recently admitted that exempted small businesses constitute 96%    of    all    the    businesses    in    the    United    States.    *See* http://www.whitehouse.gov/files/documents/health_reform_for_small_businesses.pdf   at    1 (stating that "5.8 million out of the 6 million total firms" in the U.S. are exempt from the Mandate under the small employer exemption) (last visited Oct. 24, 2013) (attached as Exhibit F).

169.    According to the government's own estimates, "nearly 34 million workers" are employed by small businesses exempt from the Mandate.  *See id.*

170.    The government's recent decision to postpone the employer mandate—i.e., the annual fine of $2000 per employee for not offering any insurance—also demonstrates that there is no compelling interest in coercing universal compliance with the Mandate concerning contraceptive and abortifacient services, since employers can now simply drop their insurance without any penalty, at least for one additional year.

171.    These broad exemptions also demonstrate that the Mandate is not a generally applicable law entitled to judicial deference, but rather is constitutionally flawed.

172.    The government's willingness to exempt various secular organizations and postpone the employer mandate, while adamantly refusing to provide anything but the narrowest of exemptions for religious organizations also shows that the Mandate is not neutral, but rather discriminates against religious organizations because of their religious commitment to promoting the sanctity of life and God's vision for human sexuality.

173.    Indeed, the Mandate was promulgated by government officials, and supported by non-governmental organizations, who strongly oppose religious teachings and beliefs regarding human life, marriage, and family.

174.    Defendant Sebelius, for example, has long been a staunch supporter of abortion rights and a vocal critic of religious teachings and beliefs regarding abortion and contraception.

175.    On October 5, 2011, six days after the comment period for the original interim final rule ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America. She told the assembled crowd that "we are in a war."

176.    She further criticized individuals and entities whose beliefs differed from those held by her and others at the fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much."

177.    Consequently, on information and belief, EWTN alleges that the purpose of the Mandate, including the restrictively narrow scope of the religious employers exemption, is to discriminate against religious organizations that oppose contraception and abortion.

## CLAIMS

### COUNT I
### Violation of the Religious Freedom Restoration Act

178.   Plaintiffs incorporate by reference all preceding paragraphs.

179.   EWTN's sincerely held religious beliefs prohibit it from deliberately providing health insurance that would facilitate access to contraception, sterilization, abortion, or related education and counseling. EWTN's compliance with these beliefs is a religious exercise.

180.   The Mandate creates government-imposed coercive pressure on EWTN to change or violate its religious beliefs.

181.   The Mandate chills EWTN's religious exercise.

182.   The Mandate exposes EWTN to substantial fines for its religious exercise.

183.   The Mandate exposes EWTN to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

184.   The Mandate imposes a substantial burden on EWTN's religious exercise.

185.   The Mandate furthers no compelling governmental interest.

186.   The Mandate is not narrowly tailored to any compelling governmental interest.

187.   The Mandate is not the least restrictive means of furthering Defendants' stated interests.

188.   The Mandate and Defendants' threatened enforcement of the Final Mandate violate EWTN's rights secured to it by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

189.   Absent injunctive and declaratory relief against the Defendants, EWTN has been and will continue to be harmed.

**COUNT II**
**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Substantial Burden**

190.    Plaintiffs incorporate by reference all preceding paragraphs.

191.    EWTN's sincerely held religious beliefs prohibit it from providing coverage for contraception, sterilization, abortion, or related education and counseling.  EWTN's compliance with these beliefs is a religious exercise.

192.    Neither the Affordable Care Act nor the Mandate is neutral.

193.    Neither the Affordable Care Act nor the Mandate is generally applicable.

194.    Defendants have created categorical exemptions and individualized exemptions to the Mandate.

195.    The Mandate furthers no compelling governmental interest.

196.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

197.    The Mandate creates government-imposed coercive pressure on EWTN to change or violate its religious beliefs.

198.    The Mandate chills EWTN's religious exercise.

199.    The Mandate exposes EWTN to substantial fines for its religious exercise.

200.    The Mandate exposes EWTN to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

201.    The Mandate imposes a substantial burden on EWTN's religious exercise.

202.    The Mandate is not narrowly tailored to any compelling governmental interest.

203.  The Mandate and Defendants' threatened enforcement of the Mandate violate EWTN's rights secured to it by the Free Exercise Clause of the First Amendment to the United States Constitution.

204.  Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

**COUNT III**
**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Intentional Discrimination**

205.  Plaintiffs incorporate by reference all preceding paragraphs.

206.  EWTN's sincerely held religious beliefs prohibit it from providing coverage for contraception, sterilization, abortion, or related education and counseling.  EWTN's compliance with these beliefs is a religious exercise.

207.  Despite being informed in detail of these beliefs beforehand, Defendants designed the Mandate and the religious exemption to the Mandate to target religious organizations such as EWTN because of their religious beliefs.

208.  Defendants promulgated both the Mandate and the religious exemption to the Mandate in order to suppress the religious exercise of EWTN and others.

209.  The Mandate and Defendants' threatened enforcement of the Mandate thus violate EWTN's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

210.  Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

### COUNT IV
**Violation of the First Amendment to the United States Constitution
Free Exercise Clause
Discrimination Among Religions**

211.     Plaintiffs incorporate by reference all preceding paragraphs.

212.     The Free Exercise Clause and Establishment Clause of the First Amendment mandate the equal treatment of all religious faiths and institutions without discrimination or preference.

213.     This mandate of equal treatment protects organizations as well as individuals.

214.     The Mandate's narrow exemption for "religious employers" but not others discriminates among religions on the basis of religious views or religious status.

215.     The Mandate and Defendants' threatened enforcement of the Mandate thus violate EWTN's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

216.     Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

### COUNT V
**Violation of the First Amendment to the United States Constitution
Establishment Clause
Selective Burden/Denominational Preference (*Larson v. Valente*)**

217.     Plaintiffs incorporate by reference all preceding paragraphs.

218.     By design, Defendants imposed the Mandate on some religious organizations but not on others, resulting in a selective burden on EWTN.

219.     The Mandate and Defendants' threatened enforcement of the Mandate therefore violate EWTN's rights secured to it by the Establishment Clause of the First Amendment to the United States Constitution.

220.    Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

**COUNT VI**
**Interference in Matters of Internal Religious Governance**
**Free Exercise Clause and Establishment Clause**

221.    Plaintiffs incorporate by reference all preceding paragraphs.

222.    The Free Exercise Clause and the Establishment Clause protect the freedom of religious organizations to decide for themselves, free from state interference, matters of internal governance as well as those of faith and doctrine.

223.    Under these Clauses, the Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, leadership, or doctrine.

224.    Under these Clauses, the Government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

225.    EWTN has made an internal decision, dictated by its Catholic faith, that the health plans it makes available to its employees may not subsidize, provide, or facilitate access to abortifacient drugs, devices, or related services.

226.    The Mandate interferes with EWTN's internal decisions concerning its structure and mission by requiring it to subsidize, provide, and facilitate practices that directly conflict with its Catholic beliefs.

227.    The Mandate's interference with EWTN's internal decisions affects its faith and mission by requiring it to subsidize, provide, and facilitate practices that directly conflict with its religious beliefs.

228.    Because the Mandate interferes with EWTN's internal decision making in a manner that affects its faith and mission, it violates the Establishment Clause and Free Exercise Clause of the First Amendment.

229.    Plaintiffs have no adequate remedy at law.

230.    Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

## COUNT VII
### Religious Discrimination
**Violation of the First and Fifth Amendments to the United States Constitution**
**Establishment Clause and Due Process**

231.    Plaintiffs incorporate by reference all preceding paragraphs.

232.    By design, Defendants imposed the Mandate on some religious organizations but not on others, resulting in discrimination among religious objectors.

233.    Religious liberty is a fundamental right.

234.    The "religious employer" exemption protects many religious objectors, but not EWTN.

235.    The "accommodation" provides no meaningful protection for EWTN.

236.    The Mandate and Defendants' threatened enforcement of the Mandate therefore violate EWTN's rights secured to it by the Establishment Clause of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

237.    Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

## COUNT VIII
### Violation of the Fifth Amendment to the United States Constitution
### Due Process and Equal Protection

238.    Plaintiffs incorporate by reference all preceding paragraphs.

239.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

240.    This mandate of equal treatment protects organizations as well as individuals.

241.    The Mandate's narrow exemption for "religious employers" but not others discriminates among religions on the basis of religious views or religious status.

242.    The Mandate and Defendants' threatened enforcement of the Mandate thus violate EWTN's rights secured to it by the Fifth Amendment of the United States Constitution.

243.    Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

## COUNT IX
### Violation of the First Amendment to the United States Constitution
### Freedom of Speech
### Compelled Speech

244.    Plaintiffs incorporate by reference all preceding paragraphs.

245.    EWTN teaches, and expresses daily to millions of people around the world, that contraception, sterilization, and abortion violate its religious beliefs.

246.    The Mandate would compel EWTN to facilitate activities that EWTN teaches are violations of its religious beliefs.

247.    The Mandate would compel EWTN to facilitate access to education and counseling related to contraception, sterilization, and abortion.

248.    Defendants' actions thus violate EWTN's right to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

249.    The Mandate's compelled speech requirement is not narrowly tailored to a compelling governmental interest.

250.    Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

## COUNT X
### Violation of the First Amendment to the United States Constitution
### Freedom of Speech
### Expressive Association

251.    Plaintiffs incorporate by reference all preceding paragraphs.

252.    EWTN teaches, and expresses daily to millions of people around the world, that contraception, sterilization, and abortion violate its religious beliefs.

253.    The Mandate would compel EWTN to facilitate activities that EWTN teaches are violations of EWTN religious beliefs.

254.    The Mandate would compel EWTN to facilitate access to government-dictated education and counseling related to contraception, sterilization, and abortion.

255.    Defendants' actions thus violate EWTN's right of expressive association as secured to it by the First Amendment of the United States Constitution.

256.    Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

## COUNT XI
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause and Freedom of Speech
### Unbridled Discretion

257.    Plaintiffs incorporate by reference all preceding paragraphs.

258.   By stating that HRSA "may" grant an exemption to certain religious groups, the Mandate vests HRSA with unbridled discretion over which organizations can have its First Amendment interests accommodated.

259.   Defendants have exercised unbridled discretion in a discriminatory manner by granting an exemption for a narrowly defined group of "religious employers" but not for other religious organizations like EWTN.

260.   Defendants have further exercised unbridled discretion by indiscriminately waiving enforcement of some provisions of the Affordable Care Act while refusing to waive enforcement of the Mandate, despite its conflict with the free exercise of religion.

261.   Defendants' actions therefore violate EWTN's right not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to it by the First Amendment of the United States Constitution.

262.   Absent injunctive and declaratory relief against the Mandate, EWTN has been and will continue to be harmed.

**COUNT XII**
**Violation of the Administrative Procedure Act**
**Lack of Good Cause and Improper Delegation**

263.   Plaintiffs incorporate by reference all preceding paragraphs.

264.   The Affordable Care Act expressly delegates to HRSA, an agency within Defendant HHS, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

265.   Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines that group health plans and insurers must cover. Proposed regulations were required to be published in the

Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

266.    Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law. Defendants, instead, wholly delegated their responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM.

267.    The IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the guidelines that it would recommend. The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

268.    Within two weeks of the IOM issuing its guidelines, Defendant HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act.

269.    Defendants have never explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking, as required by the APA.

270.    Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

271.    Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented."

272.    Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule or the NPRM, including comments by EWTN.

273.    Therefore, Defendants have taken agency action not in accordance with procedures required by law, and Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

274.     Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XIII
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Action

275.     Plaintiffs incorporate by reference all preceding paragraphs.

276.     In promulgating the Mandate, Defendants failed to consider the constitutional and statutory implications of the Mandate on EWTN and similar organizations.

277.     Defendants' explanation for its decision not to exempt EWTN and similar religious organizations from the Mandate runs counter to the evidence submitted by religious organizations during the comment period.

278.     Defendant Secretary Sebelius, in remarks made at Harvard University on April 8, 2013, essentially admitted that Defendants completely disregarded the religious liberty concerns submitted by thousands of religious organizations and individuals.

279.     Thus, Defendants' issuance of the interim final rule was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the rules fail to consider the full extent of their implications and they do not take into consideration the evidence against them.

280.     Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XIV
### Violation of the Administrative Procedure Act
### Agency Action Without Statutory Authority

281.     Plaintiffs incorporate by reference all preceding paragraphs.

282.     Defendant's authority to enact regulations under the Affordable Care Act is limited to the authority expressly granted them by Congress.

283.   Defendants lack statutory authority to include contraceptive and abortifacient services among the "preventative care" services that a group health plan and health insurance issuer must provide.

284.   Defendants lack statutory authority to coerce insurance issuers and third party administrators to pay for contraceptive and abortifacient services for individuals with whom they have no contractual or fiduciary relationship, and in violation of their contractual agreements with EWTN.

285.   Defendants lack statutory authority to prevent insurance issuers and third party administrators from passing on the costs of providing contraceptive and abortifacient services via higher premiums or other charges that are not "cost sharing."

286.   Defendants lack statutory authority to allow user fees from the federal exchanges to be used to purchase contraceptive and abortifacient services for employees not participating in the exchanges.

287.   Because the Mandate's "accommodation" for non-exempt, nonprofit religious organizations lacks legal authority, it is arbitrary and capricious and provides no legitimate protection of objecting organizations' First Amendment rights.

288.   Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

**COUNT XV**
**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**
**Weldon Amendment**
**Religious Freedom Restoration Act**
**First Amendment to the United States Constitution**

289.   Plaintiffs incorporate by reference all preceding paragraphs.

290.    The Mandate is contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110-329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008).

291.    The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

292.    The Mandate requires issuers, including EWTN, to provide coverage of all Federal Drug Administration-approved contraceptives.

293.    Some FDA-approved contraceptives cause abortions.

294.    As set forth above, the Mandate violates RFRA and the First Amendment.

295.    Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the APA.

296.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

### COUNT XVI
### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law
### Affordable Care Act

297.    Plaintiffs incorporate by reference all preceding paragraphs.

298.    The Mandate is contrary to the provisions of the Affordable Care Act.

299.    Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title"— i.e., title I of the Act, which includes the provision dealing with "preventive services"—"shall be

construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

300.    Section 1303 further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

301.    Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; only the issuer does.

302.    The Mandate requires issuers, including EWTN, to provide coverage of all Federal Drug Administration-approved contraceptives.

303.    Some FDA-approved contraceptives cause abortions.

304.    Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the APA.

305.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XVII
### Declaration that Mandate
### Does Not Preempt Alabama Law

306.    Plaintiffs incorporate by reference all proceeding paragraphs.

307.    The Mandate is unlawful because it violates the First and Fifth Amendments, the Religious Freedom Restoration Act, and the Administrative Procedure Act as identified in the foregoing counts.

308.    Alabama law provides that health insurance plans, employers, and employees may refuse to participate in health insurance systems and may refuse to provide coverage for contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling.

309.   Alabama laws that are contrary to the Mandate, including Ala. Code § 27-45-5 and Ala. Const. Amend. No. 864, are valid and enforceable despite the Supremacy Clause of the United States Constitution because the Mandate is unlawful and does not preempt or displace Alabama law.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.   Declare that the Mandate and Defendants' enforcement of the Mandate against EWTN violate the Religious Freedom Restoration Act;

b.   Declare that the Mandate and Defendants' enforcement of the Mandate against EWTN violate the First Amendment to the United States Constitution;

c.   Declare that the Mandate and Defendants' enforcement of the Mandate against EWTN violate the Fifth Amendment of the United States Constitution;

d.   Declare that the Mandate was issued in violation of the Administrative Procedure Act;

e.   Declare that the Mandate does not preempt or displace Alabama law;

f.   Issue a permanent injunction prohibiting Defendants from enforcing the Mandate against EWTN and other religious organizations that object to providing insurance coverage for contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling;

g.   Award Plaintiffs the costs of this action and reasonable attorney's fees; and

h.   Award such other and further relief as it deems equitable and just.

## JURY DEMAND

The Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted this 28th day of October, 2013.


  /s/ *S. Kyle Duncan*

S. Kyle Duncan, LA Bar No. 25038*
Lori H. Windham, VA Bar No. 71050*
Daniel Blomberg, KS Bar No. 23723*
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street NW, Suite 220
Washington, DC 20007
Tel.:    (202) 955-0095
Fax:     (202) 955-0090
kduncan@becketfund.org
lwindham@becketfund.org
dblomberg@becketfund.org


**Counsel for Plaintiff EWTN, Inc.**
*Motion for admission pro hac vice pending*



LUTHER STRANGE
   (ASB-0036-G42L)
*Alabama Attorney General*

  /s/ *Andrew L. Brasher*

Andrew L. Brasher (ASB-4325-W73B)
*Alabama Deputy Solicitor General*
William G. Parker, Jr. (ASB-5142-I72P)
*Assistant Attorney General*
**OFFICE OF THE ATTORNEY GENERAL**
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Facsimile: (334) 353-8440
abrasher@ago.state.al.us
wparker@ago.state.al.us


**Attorneys for Plaintiff the State of Alabama**