IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ETERNAL WORLD TELEVISION NETWORK, INC., et al., ) ) ) Plaintiffs, ) ) v. ) ) SYLVIA M. BURWELL, Secretary ) of the United States Department ) of Health and Human Services, et ) al., ) ) Defendants. ) | Civil Action No. 13-0521-CG-C |

# ORDER

This matter is before the court on the motions for summary judgment filed by Plaintiff Eternal World Television Network, Inc. (Doc. 29) and the State of Alabama (Doc. 27). Also before the court is a portion of the motion for summary judgment filed by Defendants[1] the U.S. Department of Health and Human Services, the U.S. Department of Labor, the U.S. Department of the Treasury, and the secretaries of those departments in their official capacities. (Doc. 34.) For the reasons that follow, Plaintiffs' motions for summary judgment are due to be denied and Defendants' motion for summary judgment is due to be granted in part.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Sylvia M. Burwell has been substituted in her official capacity for Kathleen Sebelius as Secretary of Health and Human Services.

# I. BACKGROUND

Under federal law, group health plans are generally required to cover women's health services "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg–13(a)(4). Those services "include all Food and Drug Administration (FDA)-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider." 78 Fed. Reg. 39870-01, 39870. The court will refer to those services generally as "contraceptives" and to the contraceptive-coverage requirement as "the mandate."

Plaintiff Eternal World Television Network, Inc. ("EWTN"), has a problem with the mandate. As an organization whose "mission is to serve the orthodox belief and teaching of the [Roman Catholic] Church" (Doc. 29-9 ¶ 4), EWTN opposes the use of contraceptives in any form. That belief has led EWTN to take "great pains through the years to ensure that its insurance plans do not cover, or in any way facilitate access to, sterilization, contraception, or abortion." (Doc. 29-9 ¶ 20.) As a result, EWTN does not believe that it can comply with the mandate without violating its religious beliefs.

The mandate is not insensitive to such concerns. Instead, the mandate includes an exemption for religious employers[2] and an accommodation for

---

[2] The term "religious employer" includes churches, integrated auxiliaries of

2

religious nonprofits that do not qualify for the religious-employer exemption. Under the accommodation, eligible religious nonprofits that do not qualify as religious employers (EWTN falls under this category) can opt out of the mandate by signing a short form objecting to the use of contraceptives and delivering that form to an appropriate third-party—in EWTN's case, to its health plan's third-party administrator—who would then be responsible for ensuring that the objecting organization's employees would receive contraceptive coverage at no cost to the organization.[3]

EWTN, not satisfied with the accommodation, filed this lawsuit last October against the federal agencies and officials responsible for implementing the mandate. Since then, EWTN and the State have filed partial motions for summary judgment, and Defendants have responded with a motion seeking either dismissal of or summary judgment on all counts of the complaint. Although all of those motions are ripe, EWTN seeks expedited consideration of its motion for summary judgment in order to meet a looming deadline for compliance with the mandate.[4] Because the court finds that

---

churches, conventions or associations of churches, and the exclusively religious activities of religious orders. 78 Fed. Reg. 39870-01, 39874.

[3] If EWTN's third-party administrator did not want to take on this responsibility, it would have the option of terminating its relationship with EWTN. *See* 78 FR 39870-01, 39879. But there's no evidence that that might happen here.

[4] In the same motion, EWTN requests that the court set a hearing for oral arguments. The court finds that the briefs adequately frame the issues, so no oral arguments are necessary.

expedited consideration of that motion is appropriate, this order will focus on EWTN's motion for summary judgment and will address the other pending motions only to the extent that they are intertwined with EWTN's motion.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

On a motion for summary judgment, the movant bears the initial burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the movant's arguments, the court must view all evidence and resolve all doubts in the light most favorable to the nonmovant. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds might differ on the inferences arising from undisputed facts, then [the court] should deny summary judgment." *Hinesville Bank v. Pony Exp. Courier Corp.*, 868 F.2d 1532, 1535 (11th Cir.1989).

## III. DISCUSSION

**A.     EWTN's Motion for Summary Judgment**

EWTN's motion for summary judgment[5] addresses four counts of the complaint: (1) Count I, which alleges that the mandate violates the Religious Freedom and Restoration Act; (2) Count II, which alleges that the mandate violates the Free Exercise Clause; (3) Count V, which alleges that the mandate violates the Establishment Clause; (4) and Count IX, which alleges that the mandate violates the Free Speech Clause. For the reasons that follow, all of those claims fail as a matter of law.

   *1.     Count I—The Religious Freedom and Restoration Act*

EWTN's first and most substantial attack on the mandate is mounted under the Religious Freedom and Restoration Act ("RFRA"). RFRA provides that the government may not "substantially burden" a person's religious exercise unless it can justify that burden as the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a), (b). To determine whether a law places a "substantial burden" on religious exercise, the court looks for "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Division*, 450 U.S. 707, 718 (1981). EWTN says that the

---

[5] Although EWTN alternatively moves for a preliminary injunction, a separate ruling on that motion is unnecessary because the parties agree that "there are no material disputes of fact and the legal issues for either summary judgment or a preliminary injunction are essentially identical." (Doc. 30 at 36.)

5

mandate "easily qualifies as a substantial burden under this test because it directly coerces EWTN to conform its behavior by engaging in conduct it believes is immoral." (Doc. 30 at 16 (quotations and alterations omitted).)

According to EWTN, the problem stems from Form 700, which EWTN must sign in order to receive the accommodation. Or more accurately, the problem is with the consequences that will follow after EWTN signs and delivers Form 700. The form itself is innocuous, containing only one operative provision, which does not conflict with EWTN's religious beliefs:

> I certify that, on account of religious objections, the organization opposes providing coverage for some or all of any contraceptive services that would otherwise be required to be covered; the organization is organized and operates as a nonprofit entity, and the organization holds itself out as a religious organization.

(Form 700 (Doc. 29-11 at 2).) But after EWTN signs and delivers that form, the mandate will require EWTN's third-party administrator to take on those responsibilities that EWTN has cast off. As EWTN sees it, signing Form 700 is morally equivalent to providing contraceptive coverage directly because "by executing [Form 700] and thereby designating its administrator to provide contraceptive payments to its employees, EWTN would facilitate and encourage the use of products and services in violation of its sincere religious beliefs." (Doc. 30 at 16.) Thus, by requiring EWTN to sign Form 700 as a condition of the accommodation, the mandate places a substantial burden on EWTN's religious practice. Or so the argument goes.

But EWTN's argument misunderstands the nature of RFRA's

6

substantial-burden inquiry. The question is not whether anything in the mandate will offend EWTN's religious beliefs. Instead, the focus of RFRA's substantial-burden inquiry is on the particular actions that the mandate requires EWTN to perform.

On that point, the decision of *Kaemmerling v. Lappin*, 553 F.3d 669, 678–79 (D.C. Cir. 2008), is instructive. In *Kaemmerling,* the court found that a law requiring inmates to submit to the collection of tissue samples for DNA testing did not substantially burden an inmate's religious practice despite the inmate's belief that "the collection and retention of his DNA information was tantamount to laying the foundation for the rise of the anti-Christ." *Id.* at 674. In reaching that conclusion, the court accepted "as true the factual allegations that [the inmate's] beliefs [were] sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that his religious exercise [was] substantially burdened." *Id.* at 250. The only thing the inmate was actually required to do was cooperate when prison authorities took a tissue sample, and because he did "not allege that his religion require[d] him not to cooperate with collection of a fluid or tissue sample," *id.*, the court found that there was no substantial burden on his religious practice. And the court reached that conclusion despite the inmate's insistence that the very act of "submitting to DNA sampling . . . [was] repugnant to his strongly held religious beliefs," *id.* at 245. Federal officers, not the inmate, would perform the DNA analysis, so the court would not let

7

that action determine whether there was a substantial burden on the inmate's religious exercise. *See id.* at 679.

The Supreme Court applied a similar line of reasoning in *Bowen v. Roy*, 476 U.S. 693, 106 S.Ct. 2147 (1986), when it decided that the government could use a Native American child's Social Security number despite her father's objection that doing so would rob her spirit and "prevent her from attaining greater spiritual power." *Id.* at 696. In so holding, the Court balked at the notion that the father's religious beliefs could dictate the government's actions, noting that such a claim held no more merit than one founded upon "a sincere religious objection to the size or color of the Government's filing cabinets." *Id.* at 700. Because the government's use of the child's social security number did not impair the father's "freedom to believe, express, and exercise his religion," *Id.* at 701, the Court found that his religious practice was unimpaired.

Taken together, *Kaemmerling* and *Bowen* show that the duties the mandate imposes on other parties are irrelevant to EWTN's RFRA claim. All that matters here is the action that EWTN itself is under pressure to take, which consists solely of signing and delivering Form 700. Thus, the question is whether that act, standing alone, substantially burdens EWTN's religious practice.

This court finds that it does not. As far as Form 700's substance goes, there's nothing in it that is contrary to EWTN's religious beliefs. EWTN does,

8

after all, vocally "oppose[ ] providing coverage for some or all of" the contraceptive services required under the mandate. (Doc. 29-11 at 2). And as for the act of delivering Form 700 to its third-party administrator, EWTN cannot explain how that act violates its religion without reference to the obligation that the mandate will impose upon others after EWTN delivers the form. As discussed above, the burdens that the mandate imposes upon other parties cannot amount to a substantial burden on EWTN's religious practice.

EWTN tries to avoid that conclusion by arguing that by signing Form 700, it would "'designat[e]' [its third-party] administrator as the 'plan administrator and claims administrator for contraceptive benefits'" (Doc. 29-9 ¶ 17 (quoting 78 Fed. Reg. 39870-01, 39879 (first alteration in original))), an act that would directly violate its religious beliefs. A number of district courts have found that basic reasoning persuasive. *See, e.g., S. Nazarene Univ. v. Sebelius*, No. CIV–13–1015–F, 2013 WL 6804265, at *8 (W.D. Okla. Dec. 23, 2013) ("The self certification is, in effect, a permission slip which must be signed by the institution to enable the plan beneficiary to get access, free of charge, from the institution's insurer or third party administrator, to the products to which the institution objects.") But that argument attributes far too great a legal effect to Form 700, which serves only to provide notice of EWTN's decision to opt out of the mandate's contraceptive coverage requirement. To the extent that EWTN's third-party administrator is under compulsion to act, that compulsion comes from the law, not from Form 700.

The Seventh Circuit explained that point in a challenge to the mandate filed by the University of Notre Dame:

> Federal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services. By refusing to fill out the form Notre Dame would subject itself to penalties, but [its third-party administrator] would still be required by federal law to provide the services to the university's students and employees unless and until their contractual relation with Notre Dame terminated.

*Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 554 (7th Cir. 2014). See also *Michigan Catholic Conference and Catholic Family Services, et al v. Burwell*, Nos. 13-2723, 13-6640, 2014 WL 2596753, at *9 - *11 (6th Cir. June 11, 2014). The court agrees with that conclusion.

Legally (if not morally) speaking, there is a world of difference between a law that compels EWTN to provide contraceptive coverage directly and one in which the government places that burden on someone else after EWTN opts out. Because EWTN's only religious objection to the mandate hinges upon the effect it will have on other parties after EWTN signs Form 700 rather than anything inherent to the act of signing and delivering Form 700 itself, the court finds that the mandate does not impose a substantial burden on EWTN's religious practice within the meaning of RFRA. As a result, EWTN's RFRA claim fails as a matter of law.

### 2. *Count II—Free Exercise*

EWTN's next claim is that the mandate violates the First

Amendment's Free Exercise Clause, which provides that Congress shall make no law "prohibiting the free exercise" of religion, U.S. Const. amend. I. Specifically, EWTN claims that the mandate unlawfully burdens religious exercise because it "allows massive categorical exemptions for secular conduct that undermine the Mandate's purposes while denying religious exemptions to organizations like EWTN" (Doc. 30 at 29) and that the mandate "expressly discriminates among religious objectors" (Doc. 30 at 30). EWTN makes those claims in an effort to show that the mandate is neither neutral nor generally applicable, which would mean the mandate would be subject to strict scrutiny. Otherwise, the law would be subject only rational-basis review, because laws that are "neutral and of general applicability need not be justified by a compelling governmental interest even if [they have] the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). EWTN's argument fails, however, because the mandate is both neutral and generally applicable.

Beginning with neutrality, the court rejects EWTN's claim that the mandate is non-neutral. For a law to be non-neutral within the meaning of the Establishment Clause, there has to be evidence of a purpose to "infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. There's nothing in the mandate that shows an attempt to restrict EWTN's religious practices "because of their religious motivation." *Lukumi*,

508 U.S. at 533. To the contrary, to the extent that the mandate imposes an incidental burden on EWTN's religious practices, the accommodation serves as evidence that the government made a determined effort to mitigate that burden. EWTN also argues that the mandate is non-neutral because it provides a total exemption for some religious employers while others are only eligible for the accommodation. EWTN calls this "open discrimination among religious institutions." (Doc. 30.) But that argument misses the mark; to the extent that the mandate treats some religious organizations differently than others, the difference has nothing to do with the organization's religious beliefs or practices; it turns upon whether the organization qualifies for tax-exempt status under the Internal Revenue Code. 78 Fed. Reg. 39870-01, 39874 (defining a religious employer as an organization that is "organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code"). That is a legitimate basis for differential treatment, *see Walz v. Tax Commission of City of New York*, 397 U.S. 664, 680 (1970) (holding that the government may grant special tax benefits to churches without running afoul of the Establishment Clause), so the court concludes that the mandate is religiously neutral.

      EWTN's arguments about the mandate's general applicability also fail to persuade. To determine whether the mandate is generally applicable, the court looks to see whether the mandate includes secular exemptions intended to ensure that it "impose[s] burdens only on conduct motivated by religious

belief." *See Lukumi*, 508 U.S. at 543; *accord Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1309 (11th Cir. 2006). According to EWTN, the contraceptive-coverage regulations are not generally applicable because they allow "massive categorical exemptions for secular conduct . . . while denying religious exemptions to organizations like EWTN." (Doc. 30 at 29.)

To be fair, EWTN's premise is factually accurate, if somewhat overstated: the rules that apply to grandfathered health plans and small businesses function as limited exemptions to the mandate's contraceptive-coverage requirement. But that fact does not necessarily undermine the mandate's general applicability. Lawmakers are free to carve out exceptions from a general rule without running afoul of the Establishment Clause so long as those exceptions are equally available to secular and religious organizations. *See Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-03489-WSD, 2014 WL 1256373, at *24 (N.D. Ga. March 26, 2014) ("Specific exemptions to a law that are equally available to the adherents of a religious belief do not affect the law's general applicability.") The rules applicable to grandfathered health plans and small employers are equally available to religious and secular employers, so they do not undermine the mandate's general applicability.

Because the regulations are neutral and generally applicable, they are subject only to rational-basis review. *See GeorgiaCarry.Org, Inc. v. Georgia,*

687 F.3d 1244, 1256 (11th Cir. 2012) ("If a law is one that is neutral and generally applicable, then rational basis scrutiny should be applied . . . ."). That means the mandate is presumptively valid, and EWTN bears the burden of proving that it is not "rationally related to a legitimate government interest." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 880 (11th 2011).

Here, there's no doubt that "[e]nsuring access to affordable healthcare is a legitimate legislative objective." *Deen v. Egleston,* 597 F.3d 1223, 1231 (11th Cir. 2010) (quotations omitted). And EWTN makes no attempt to prove that the regulations are not rationally related to that objective. Because EWTN does not even come close to shouldering its burden of "negat[ing] every conceivable basis that might support" the mandate, *Leib v. Hillsborough Cnty. Pub. Transp. Com'n*, 558 F.3d 1301, 1306 (11th Cir. 2009), its Free Exercise claim fails as a matter of law.

### 3. *Count V—Establishment Clause*

EWTN's final religious-liberty claim is that the regulations violate the Establishment Clause because some religious employers are totally exempt from the mandate while other nonprofits like EWTN are only eligible for an accommodation. According to EWTN, that arrangement amounts to "'discrimination . . . expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations.'" (Doc. 30 at 32 (quoting *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008)).

14

But that argument fails because the mandate does not treat religious organizations differently based on their degree of religiosity. Instead, the distinction between an organization that qualifies for the religious-employer exemption and one that does not has solely to do with the organization's tax structure. 78 Fed. Reg. 39870-01, 39874. That is a valid basis of differentiation, and it doesn't implicate the establishment clause. *See Roman Catholic Archdiocese of Atlanta*, 2014 WL 1256373 at *30 ("Line drawing by the Government based on the structure and purpose of religious organizations is permissible under the Establishment Clause."). As a result, EWTN's Establishment Clause claim fails as a matter of law.

### 4. *Count IX—Compelled Speech*

EWTN's final claim accuses the mandate of violating the First Amendment right to be free from compelled speech, which prohibits the government from "telling people what they must say." *Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*, 547 U.S. 47, 61 (2006). According to EWTN, the regulations amount to compelled speech because the accommodation is only available to an organization after it makes "certifications about its religious objections to its insurer in a form and manner specified by" the government. (Doc. 30 at 34 (quotations omitted).)

But EWTN's argument rests on an overly broad understanding of the compelled-speech doctrine. Properly understood, the right to be free from compelled speech "prohibits the government from compelling citizens to

15

express beliefs that they do not hold," *Foley v. Orange County*, No. 6:12–cv–269–Orl–37KRS, 2013 WL 4110414, at *12 (M.D. Fla. Aug. 13, 2013) (emphasis removed). But when the government sets out to regulate conduct, the fact that "the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed," is not sufficient to show a compelled-speech violation. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). When compelled speech is purely incidental to the government's regulation of conduct, there is no First Amendment problem.

Here the accommodation's certification requirement does not compel EWTN to express any opinions or beliefs that it does not hold. To the contrary, EWTN is not even allowed to sign Form 700 unless it believes that the form's contents are "true and correct." (Doc. 29-11 at 2.) And to the extent the accommodation requires EWTN to certify its beliefs in a particular form, that requirement is meant only to facilitate appropriate notice of EWTN's decision to opt out of the mandate's requirements. That notice requirement is a regulation of conduct, not speech, and the fact that Form 700 uses written words to facilitate that notice is purely incidental. *See, e.g., Univ. of Notre Dame*, 2013 WL 6804773, at *20 ("[T]he certification requirement regulates conduct, not speech."); *Roman Catholic Archdiocese of Atlanta v. Sebelius*, 2014 WL 1256373, at *29 (N.D. Ga. March 26, 2014) ("The compulsion to fill out a form and express statements that are consistent with Plaintiffs' beliefs is merely incidental to the regulation of conduct . . . ."). As a result, EWTN's

16

compelled-speech claim fails as a matter of law.

Before moving on, the court notes that EWTN raised a new First Amendment claim in its reply brief. Under the heading "Compelled Silence," EWTN argues that the accommodation's so-called gag order violates the First Amendment by prohibiting organizations that seek the accommodation from interfering with or influencing their third-party administrator's arrangements for contraceptive coverage, 26 C.F.R. 54.9815-2713A(b)(iii). That argument has succeeded in other lawsuits challenging the mandate. *See, e.g., Roman Catholic Archdiocese of Atlanta*, 2014 WL 1256373, at *29 (granting summary judgment in favor of a Free Speech challenge to the gag order). But it is not properly at issue in this lawsuit. The only Free Speech claim in EWTN's complaint is the compelled-speech claim addressed above, and EWTN has not amended its complaint to add a challenge to the gag order. As a result, despite EWTN's effort to raise the issue in its reply brief, there is no compelled-silence claim properly before the court at this time. *See Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 (11th Cir. 1987) ("It is well settled that a party cannot argue an issue in its reply brief that was not preserved in its initial brief."); *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

**B.     The State's Motion for Summary Judgment**

As the State points out, Defendants give "no real response to the

State's claims or its motion for summary judgment." (Doc. 48.) But that's only because the State made no real arguments. Instead, the State's motion for summary judgment does little more than incorporate EWTN's arguments by reference and ask for an additional form of relief. (Doc. 28 at 7.) As a result, the success of the State's motion depends on the merits of EWTN's. And because EWTN's motion for summary judgment is due to be denied, the State's is, too.

C. **Defendants' Motion for Summary Judgment.**

As discussed above, there are no genuine issues of material fact on Counts I, II, V, and IX, and all of those claims fail as a matter of law. As a result, Defendants' motion for summary judgment is due to be granted on those counts. The court will address the remainder of Defendants' motion in a separate order.

## IV. CONCLUSION

It is therefore ORDERED as follows:

(1) EWTN's motion to expedite summary judgment proceedings (Doc. 55) is **GRANTED**;

(2) EWTN's motion for summary judgment (Doc. 29) is **DENIED**;

(3) Defendants' motion for summary judgment (Doc. 34) is **GRANTED** with respect to Counts I, II, V, and IX of the complaint.

The court will address EWTN's motion for discovery under 56(d) and the

remainder of Defendants' dispositive motion in a separate order.

**DONE** and **ORDERED** this 17th day of June, 2014.

/s/ Callie V. S. Granade
**UNITED STATES DISTRICT JUDGE**